UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:11-CV-237-F

| | | |
|---|---|---|
| LESONYA JEFFERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| BIOGEN IDEC INC., | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the Motion for Summary Judgment [DE-30] filed by Defendant Biogen Idec, Inc. ("Biogen"). Plaintiff LeSonya Jefferson ("Jefferson") has filed a response, and Biogen has replied. Additionally, Jefferson has filed a surreply, in response to which Biogen has filed a Motion to Strike [DE-38]. Both the Motion for Summary Judgment and the Motion to Strike are ripe for ruling.

## I. STATEMENT OF THE CASE

On April 13, 2011, Jefferson initiated this action by filing a Complaint in the North Carolina General Court of Justice, Superior Court Division, in Wake County. In the Complaint, Jefferson alleged Biogen "violated the North Carolina Constitution by discriminating against Plaintiff due to her disability" and "violated the public policy of the State of North Carolina by terminating Plaintiff's employment based on her disability." Notice of Removal, Ex. A, Compl. [DE-1-1] ¶ 26. In her "Claim for Relief" Jefferson alleged Biogen "intentionally discriminated against Plaintiff in violation of the North Carolina Persons with Disabilities Protection Act by its discharge of her, in that it discharged her because it regarded her as disabled and because she had a record of disability." *Id.* ¶ 30.

On May 12, 2011, Biogen removed the action to this court, on the basis of diversity jurisdiction, and filed an Answer [DE-2] to the complaint. On July 1, 2011, Jefferson filed a document entitled "Amended Complaint" [DE-11]. In an order filed on August 12, 2011 [DE-18], the court deemed the "Amended Complaint" to be a motion to amend the complaint, which the court denied. Biogen now moves for summary judgment on any and all claims alleged in the Complaint.

## II. STATEMENT OF THE FACTS

In the light most favorable to Jefferson, the facts are as follows:

Starting in 2010, Jefferson began to take leave from work under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, in order to take her daughter to allergy shot appointments. At Biogen, FMLA leaves, as well as requests for short term disability ("STD") and long term disability ("LTD") benefits, are administered by a third-party provider, Matrix. Biogen, therefore, typically is not made aware of the reasons for an employee's leave request. Instead, for purposes of FMLA leave and STD determinations, the personal medical information provided in support of such leaves is directed to and reviewed by Matrix personnel. Biogen Human Resources, in contrast, is only notified of the requests for FMLA leave and STD benefits and the expected return to work date; Biogen Human Resources is not told of the reasons, nor provided with copies of the medical information provided in support of claims for FMLA leaves or STD benefits. Matrix approved Jefferson's request for FMLA leave to care for her daughter.

Thereafter, beginning June 24, 2010, Jefferson again requested and was approved by Matrix for FMLA leave from work due to her own health condition, severe back pain. She then had breast reduction surgery on June 29, 2010. After the breast reduction surgery, Jefferson still

2

was experiencing back pain despite engaging in physical therapy. She then underwent back surgery on September 7, 2010 to help alleviate her back pain. Following her surgery, she was released from the hospital on September 11, 2010, into the care of her parents.

Meanwhile, by August 24, 2010, Jefferson had exhausted all of her FMLA leave provided under the law. Pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, Biogen sent Jefferson a letter on August 24, 2010, via overnight mail, which stated in pertinent part the following:

> . . . As you know, you have been on a leave of absence since June 24, 2010 and you have exhausted your 12 weeks of FMLA leave.
>
> The purpose of this letter is to initiate a dialogue with you and your health care provider regarding the duration of your disability. Since it is unclear to us if and when you will be able to return to work, we will need to receive additional information from your treating health care provider regarding the duration of your disability.
>
> Please sign the attached letter and send it and the attached questionnaire to your treating healthcare provider asking him or her to respond fully to our questions. They should be returned to Heather Gale no later than the close of business on **September 7, 2010** so that we can consider your request in a timely fashion.
>
> THE INFORMATION WE ARE REQUESTING IS SEPARATE AND APART FROM ANY INFORMATION OR DOCUMENTATION REQUESTS IN CONNECTION WITH STD BENEFITS, LTD BENEFITS OR FMLA. YOU MUST RESPOND TO ANY REQUESTS FROM MATRIX/RELIANCE SEPARATELY. ANY REQUESTS FOR TIME OFF FROM WORK DUE TO A SERIOUS HEALTH CONDITION SHOULD BE HANDLED THROUGH MATRIX/RELIANCE AND THE FMLA/STD PROCESS[.]
>
> If you have any questions regarding this letter, please contact me at 919-993-6135[.]

Dep. of LeSonya Jefferson, Ex. 5 [DE-31] at p. 44. Attached to the letter was a "Healthcare Provider Disability and Accommodation Questionnaire" for Jefferson's healthcare provider to

3

complete. *Id.* at pp. 46-48.

Jefferson admits that she received the letter, albeit after the September 7, 2010, deadline, because she had no one to retrieve the letter for her from the post office. When Jefferson did not respond to the letter, Heather Bowen,[1] a Biogen human resources employee, called and left a voicemail for Jefferson following up on the letter. Jefferson contends she received both the August 24, 2010, letter and Bowen's voicemail on September 13, 2010, and she called Bowen back and left a voicemail. Jefferson contends in the voicemail she informed Bowen she had just been released from the hospital and was housebound and bedridden. She told Bowen in the message she would "have somebody go by and check on it and get everything" and she asked Bowen to give her a call. Dep. of LeSonya Jefferson [DE-31-2] at pp. 127-28.

In response, Biogen sent another letter to Jefferson on September 13, 2010. It was practically identical to the August 24, 2010, letter, except that it requested information from Jefferson and her healthcare provider by the close of business on September 22, 2010. Dep. of LeSonya Jefferson, Ex. 6 [DE-31-2] at p. 49. Jefferson contends she again received the letter after Biogen's stated deadline, but she called and left another message for Bowen.

Bowen called Jefferson on September 30, 2010. Jefferson contends she had just taken medication and "was out of it completely," although she does remember numerous details of the conversation. Dep. of LeSonya Jefferson [DE-31-2] at pp. 129-30. During the conversation, Bowen asked Jefferson if she had received the paperwork from Biogen, and if she was trying to ignore the letters. Jefferson responded that she had received the letters, but she did not

---

[1] Heather Bowen was, at the time of the events giving rise to this action, known as Heather Gale.

4

understand why, because she had sent "everything" to Matrix. Bowen informed Jefferson she also had to send the requested information to Biogen. Jefferson contends she told Bowen she did not understand, and Bowen explained that Biogen also needed the information so it could make accommodations for her. Jefferson responded that she did not need any accommodations because she was in bed and not able to do anything at that point. Jefferson also questioned why Biogen could not get the information from Matrix. *Id.* at pp. 129-31.

In response, Bowen asked, "So you're telling me you're not going to send it in?" *Id.* at p. 131. Jefferson replied that was not what she was saying, but rather she did not understand the process. She also told Bowen she was on heavy medication and "the dots are not connecting right now." *Id.* . Jefferson also questioned whether sending the requested information to Biogen would compromise her privacy. Jefferson and Bowen then ended the conversation.

Jefferson contends she called Bowen back within the next day or so, but did not receive a response from her. Instead, on October 6, 2010, Biogen sent another letter to Jefferson, , captioned "Employment Status." The letter stated, in pertinent part:

> On two separate occasions, August 24th and September 13th, I sent you a letter in order to initiate a dialogue with you and your healthcare provider regarding the duration of your disability. We also had a telephone conversation on September 30th about the status of your healthcare provider's response.
>
> We have made several attempts to communicate with you about the status of your leave and you have refused to provide us with the requested information. LeSonya, we have explained to you on several occasions that Biogen Idec, apart from Matrix, needs this information in order to determine if we can continue to accommodate your leave of absence. If I do not receive the requested documentation by October 12th, Biogen Idec will have no basis to continue to hold your position and your employment will be severed.
>
> Another copy of the questionnaire is enclosed. Should you have any questions I can be reached at 919-993-6135.

Dep. of LeSonya Jefferson, Ex. 7 [DE-31-2] at p. 54.

Jefferson admits receiving the letter. She called one of her doctors, trying to find out if he was not sending information to Matrix. She did not send the Biogen questionnaire to the doctor, however, because she felt it covered the same information the doctor was sending to Matrix. Jefferson notes that written policies from Biogen and correspondence from Matrix indicate that she was to communicate with Matrix regarding her leave. *See* Notification and Approval Process for Extended Absence-US [DE-35-4] (instructing employees to notify a supervisor as soon as possible if the employee needs a leave of absence and then "notify Matrix/Reliance Standard . . . to initiate certification and ongoing administration of your claim"); Family Medical and Leave Act-US [DE-35-8] ("If an FMLA or non-FMLA medical or maternity leave is because of an employee's own serious health condition . . . the employee will be required, prior to returning to work, to . . . submit required documentation to Biogen Idec's medical and FMLA leave administrator Matrix/Reliance Standard.").

When Jefferson did not return the questionnaire by October 12, 2010, Biogen sent a letter dated October 14, 2010, which stated the following:

> We have made several attempts to communicate with you regarding the status of your leave and you have failed to respond. Therefore Biogen Idec has no basis to continue to hold your position and your employment has been severed effective October 15, 2010.

Dep. of LeSonya Jefferson, Ex. 8 [DE-31-2] at p. 54. Jefferson's employment, therefore, was terminated effective October 15, 2010. Jefferson eventually filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), and after receiving a right to sue notice, initiated suit in state court.

## III. MOTION TO STRIKE

Biogen moves to strike Jefferson's surreply [DE-37], which she filed without asking or receiving permission to do so from this court.

The Local Civil Rules for the Eastern District of North Carolina only allow for the filing of a motion, a response to a motion, and a reply. *See* Local Civil Rule 7.1; *Freeman v. City of Fayetteville*, 971 F. Supp. 971, 973 n.1 (E.D.N.C. 1997) ("The Local Rules of this court do not allow for the submission of sur-replies."). Accordingly, courts generally allow a party to file a surreply "only when fairness dictates based on new arguments raised in the previous reply." *DiPaulo v. Potter*, 733 F. Supp. 2d 666, 670 (M.D.N.C. 2010).

In this case, Jefferson did not seek leave from this court to file the surreply, nor did she offer an explicit argument that a surreply was necessary because of new arguments raised in Biogen's reply. The court's own review of Biogen's reply and Jefferson's surreply, however, reveals that Biogen *did* advance a new argument in its reply which could merit a surreply. Specifically, Biogen argued that other Biogen employees who exhausted their FMLA leave at or about the same time as Jefferson received correspondence identical to that received by Jefferson, and each of these employees returned the requested information. Biogen also attached additional evidence–a declaration from Heather Bowen and attached correspondence–supporting this new argument. Because the reply advanced a new argument and introduced new evidence, the court will, under these circumstances, consider Jefferson's surreply to the extent it addresses this new argument from Biogen. The court will disregard the surreply in all other respects, because it does not address any new arguments raised by Biogen in its reply. Biogen's motion to strike [DE-37] is therefore DENIED.

## III. SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden initially of coming forward and demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When making the summary judgment determination, the facts and all reasonable inferences must be viewed in the light most favorable to the non-movant. *Liberty Lobby*, 477 U.S. at 255. Once the moving party has met its burden, the non-moving party then must come forward and demonstrate that such a fact issue does indeed exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish any one of the essential elements of the party's claim on which he will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322-23.

## IV. SUMMARY JUDGMENT ANALYSIS

At the outset, the court notes that Biogen contends the Complaint only vaguely alludes to a wrongful discharge claim under North Carolina common law and should not be construed as stating such a claim. The court, however, will assume that Jefferson has alleged two separate claims: one for wrongful discharge in violation of public policy, and one under the North Carolina Persons with Disabilities Protection Act, ("NCPDPA"), N.C. Gen. Stat. § 168A-1 *et seq.*. Biogen moves for summary judgment on both of Jefferson's claims, arguing, *inter alia*, that (1) Jefferson's NCPDPA claim must be dismissed for lack of jurisdiction; (2) Jefferson failed to adequately identify public policy to support the common law wrongful discharge claim,

8

and (3) Jefferson has insufficient evidence to support either claim.

**A. The court does not have jurisdiction to consider Jefferson's NCPDPA claim**

Biogen argues the court lacks jurisdiction over Jefferson's NCPDPA claim, by virtue of statutory limitations on jurisdiction in the NCPDPA itself. Specifically, the NCPDPA provides, in pertinent part:

> No court shall have jurisdiction over an action filed under this Chapter where the plaintiff has commenced federal judicial or administrative proceedings under . . . the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et seq., as amended, or federal regulations promulgated under that Act, involving or arising out of the facts and circumstances involved in the alleged discriminatory practice under this Chapter.

N.C. Gen. Stat. § 168A-11(c). Biogen argues that because Jefferson first filed an administrative charge of disability discrimination with the EEOC on November 2, 2010, before she filed her NCPDPA lawsuit on April 13, 2011, the court lacks jurisdiction. The court agrees, albeit for a slightly different reason.

This court has not located a decision from the North Carolina Supreme Court interpreting the NCPDPA's statutory jurisdiction limitation, but the court finds the decision in *Bowling v. Margaret R. Pardee Memorial Hospital*, 179 N.C. App. 815, 635 S.E.2d 624 (2006), by the North Carolina Court of Appeals to be instructive.[2] In *Bowling*, the plaintiff filed a claim with the EEOC after his employment was terminated by his employer. While his administrative claim with the EEOC was pending, he filed suit in state court, asserting, *inter alia*, a claim under the

---

[2] In examining Biogen's arguments regarding the NCPDPA claim, the court is cognizant that it is sitting in diversity jurisdiction. Accordingly, this court must apply state law as interpreted by the highest state court, the North Carolina Supreme Court. If the North Carolina Supreme Court has not decided a particular issue, the court may consider rulings of lower state courts to be persuasive evidence of state law. *Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002).

9

NCPDPA. His employer moved to dismiss the NCPDPA claim, and while the motion to dismiss was pending, the EEOC issued a right-to-sue letter to plaintiff. Thereafter, the trial court dismissed the NCPDPA claim. On appeal, the North Carolina Court of Appeals affirmed the dismissal, noting that "[u]sing clear and concise language, the General Assembly has disallowed concurrent jurisdiction over a [NCPDPA] claim and an ADA claim that arise out of the same facts and circumstances." *Id.* at 820, 635 S.E.2d at 629. The court specifically found the fact the EEOC had issued the right-to-sue letter prior to the trial court ruling on the motion to dismiss to be "immaterial" because the trial "court never had jurisdiction over the case at all because it was initially filed after [the plaintiff] had already 'commenced federal . . . administrative proceedings,' such that federal jurisdiction was attached." *Id.* Additionally, the court observed that the plaintiff had an additional 90 days from the issuance of the right-to-sue letter to file suit in federal court, and the trial court's ruling on the motion to dismiss came within that 90-day period. *Id.* The court concluded:

> The clear meaning of the language of N.C. Gen. Stat. § 168A-11(c) does not allow a plaintiff to file simultaneous federal and state claims, then see which one has a better chance of being successful. A plaintiff must either choose a single forum at the outset and proceed accordingly, *or ensure that one claim or the other is completely concluded within the statute of limitations so that he may move forward with the other*.

*Id.* at 820-21, 635 S.E.2d at 629 (emphasis added).

In the instant case, Jefferson first filed an administrative claim with the EEOC, received a right to sue letter from the EEOC in February 2011, then filed suit in state court on April 13, 2011. Assuming she received the right-to-sue letter on February 1, 2011, the filing of the instant action was still within the 90-day filing period for federal ADA claims. In other words, her

10

federal ADA claim, which was commenced by filing a charge with the EEOC, was not "completely concluded" before she filed her state law claim. *See Id.* at 821, 635 S.E.2d at 629. The state court–and this court, by virtue of removal–lacked jurisdiction over her NCPDPA claim. Biogen's Motion for Summary Judgment [DE-30] is therefore ALLOWED as to Jefferson's claim under the NCDPDA.[3]

## B. Jefferson's Wrongful Discharge Claim Lacks Sufficient Evidence

Biogen also moves for summary judgment on Jefferson's claim for wrongful discharge in violation of public policy, arguing (1) she failed to identify the requisite public policy in her Complaint and (2) she lacks sufficient evidence to support such a claim.

As a general rule in North Carolina, an employee at-will has no claim for wrongful discharge; however, the employment at-will doctrine is not without limits and "a valid claim for relief exists for wrongful discharge of an employee at will if the contract is terminated for an unlawful reason or a purpose that contravenes public policy." *Tompkins v. Allen*, 107 N.C. App. 620, 622, 421 S.E.2d 176, 178 (1992). A plaintiff bears the burden of pleading that her dismissal occurred for a reason that violates the public policy of North Carolina. *Salter v. E & J Healthcare, Inc.*, 155 N.C. App. 685, 693, 575 S.E.2d 46, 51 (2003). "Public policy" has been defined by North Carolina courts to mean "the principle of law which holds that no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good." *Coman v. Thomas Mfg. Co.*, 325 N.C. 172, 175 n.2, 381 S.E.2d 445, 447 n.2 (1989). Although there is no "laundry list of what is or is not 'injurious to the public or against the public good,' at

---

[3] Alternatively, even if the court does possess jurisdiction over Jefferson's NCDPDA claim, the court concludes she has proffered insufficient evidence in support of such claim, for the reasons stated in the court's analysis of her wrongful discharge claim.

11

the very least public policy is violated when an employee is fired in contravention of express policy declarations contained in the North Carolina General Statutes." *Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 353, 416 S.E.2d 166, 169 (1992) (footnote omitted). Accordingly, to allege a claim for wrongful discharge, a plaintiff should allege that a "defendant's conduct violated [an] explicit statutory or constitutional provision, [or] allege defendant encouraged plaintiff to violate [a] law that might result in potential harm to the public." *Considine v. Compass Group USA, Inc.*, 145 N.C. App. 314, 321, 551 S.E.2d 179, 184 (2001). Alternatively, a plaintiff may allege a termination violated one of the "exceptions to [the employment at will] doctrine grounded in considerations of public policy designed to prohibit status-based discrimination." *Kurtzman v. Applied Analytical Indus., Inc.*, 347 N.C. 329, 333-34, 493 S.E.2d 420, 423 (1997).

Here, Biogen argues that Jefferson's allegations in her Complaint are deficient because she failed to identify the specific statutory or constitutional provision upon which her claim for wrongful discharge is based. *See* Compl. [DE-1-1] ¶ 26 ("Defendant violated the North Carolina Constitution by discriminating against Plaintiff due to her disability. Defendant also violated the public policy of the State of North Carolina by terminating Plaintiff's employment based on her disability, while she was out of work on short-term disability recovering from surgery and was advised by her treating physician not to work during her recovery."). Biogen, however, also infers that Jefferson is relying upon the public policy set forth in the North Carolina Equal Employment Practices Act ("NCEEPA"), N.C. Gen. Stat. § 143-422.2,[4] and Jefferson confirms

---

[4] The NCEEPA provides:

It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly

12

this interpretation in her response to the motion for summary judgment. The court, therefore, declines to dismiss her claim based on any perceived deficiency in the Complaint, and instead will examine whether she has proffered sufficient evidence in support of her claim that she was wrongfully discharged in violation of the public policy set forth in the NCEEPA. *See, e.g., Simmons v. Chemol Corp.*, 137 N.C. App. 319, 322, 528 S.E.2d 368, 370 (2000) (recognizing that a plaintiff may state a wrongful discharge claim where she alleges she was terminated on the basis of her handicap, in violation of the public policy set forth in the NCEEPA).

In evaluating state law discrimination claims, North Carolina courts "look to federal decisions for guidance in establishing evidentiary standards and principles of law to be applied in discrimination cases." *Dep't of Correction v. Gibson*, 308 N.C. 131, 136, 302 S.E.2d 78, 82 (1983). Accordingly, when faced with state law wrongful discharge on the basis of handicap/disability claims, courts utilize the evidentiary framework used in evaluating disability discrimination claims under the ADA. *See Youse v. Duke Energy Corp.*, 171 N.C. App. 187, 193, 614 S.E.2d 396, 401 (2005) (approving the evidentiary scheme used in evaluating claims for disability discrimination under the ADA for wrongful discharge claims on the basis of handicap); *Morris v. BellSouth Telecomm.*, 302 F. Supp. 2d 515, 524-25 (M.D.N.C. 2004) ("[S]tate law claims for wrongful termination for discharge due to handicap are analyzed with the same burden shifting test as claims brought under the ADA.").

Under this burden-shifting evidentiary scheme, the plaintiff first bears the burden of

---

employ 15 or more employees.

N.C. Gen. Stat. § 143-422.2.

13

establishing a prima facie case of disability discrimination, which requires evidence showing that (1) she is disabled;[5] (2) she suffered an adverse employment action; (3) at the time of the adverse employment action, she was meeting her employer's legitimate expectations; and (4) the adverse employment action occurred under circumstances giving rise to a reasonable inference of unlawful discrimination. *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001). If the plaintiff successfully establishes a prima facie case, the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for its action. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49-50 (2003). If the employer does so, the plaintiff then bears the burden of proving by a preponderance of the evidence that the employer's proffered reason for the termination is a mere pretext for unlawful discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). A plaintiff "can prove pretext by showing that the [employer's] explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [disability discrimination]." *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004) (internal quotations omitted).

The court concludes that Jefferson has not met her burden in showing that her employment was terminated on the basis of her disability. The court will assume, for purposes of this motion, that Jefferson has proffered sufficient evidence to establish a prima facie case of disability discrimination. *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 319

---

[5] The NCEEPA does not define "handicap," so North Carolina courts "turn to other North Carolina statutes relating to the same subject matter to determine legislative intent." *Simmons*, 137 N.C. App. at 322, 528 S.E.2d at 570. Courts generally have used the NCPDPA's definition of "person with a disability" to determine the meaning of "handicapped person" within the meaning of the NCEEPA. *See id.*; *see also* N.C. Gen. Stat. § 168A-3 (providing definition for "person with a disability").

(4th Cir. 2005) (assuming for purposes of appeal that plaintiff established prima facie case of discrimination). Even if this court assumes that she has proffered sufficient evidence to establish a prima facie case of discrimination, however, the court finds that Biogen has met its burden of production by proffering a legitimate, non-discriminatory reason for Jefferson's termination: she failed to send Biogen the medical documentation Biogen requested in the three letters it sent to Jefferson. *Cf. Badgett v. Federal Express Corp.*, 378 F. Supp. 2d 613, 628 (M.D.N.C. 2005) (finding that employer's statement that plaintiff was terminated for failing to return to work after a 30-day absence and failure to provide medical documentation supporting her absence to be a legitimate, non-discriminatory reason for plaintiff's termination). The court also finds that Jefferson has failed to proffer sufficient evidence which would allow a reasonable jury to conclude that Biogen's proffered reason for her termination is a mere pretext for disability discrimination.

Specifically, Jefferson proffers three main attacks on Biogen's reason for terminating her: (1) she was discharged because Biogen did not want to shoulder the medical costs–in the form of increased medical insurance premiums–associated with her medical care; (2) she had complied with Biogen's previously-stated policies with regard to medical leave, and (3) she was confused by Biogen's request for additional medical documentation. None of these arguments is sufficient to create a jury question on the issue of disability discrimination.

Her first argument–Biogen's desire to avoid increased medical costs–is not supported by any evidence in the record. Accordingly, it amounts to sheer speculation on her part. To create an issue of fact, "[p]laintiff must come forward with admissible evidence that is more than self-serving opinions or speculation." *Guseh v. North Carolina Central Univ.*, 423 F. Supp. 2d 550,

15

557 (M.D.N.C. 2005) (citing *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998)).

Nor do Jefferson's remaining two arguments suffice to create a jury question on disability discrimination. Regardless of the fact that Biogen designated Matrix as its "medical leave and FMLA leave administrator" in certain written policies, it is undisputed that Biogen later clearly communicated with Jefferson that it required her to submit additional medical documentation to Biogen itself. That Jefferson either did not understand the directive or chose not to obey it does not, standing alone, render Biogen's stated reason for terminating her employment unworthy of credence, nor is it sufficiently probative of disability discrimination. In the end, Jefferson is decrying the fairness of Biogen's request for additional documentation and her subsequent termination for failing to comply with the request. The question before the court, however, is not whether Biogen's decision was " 'wise, fair, or even correct.' " *DeJarnette v. Corning*, 133 F.3d 293, 299 (4th Cir. 1998) (quoting *Giannopoulous v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7th Cir. 1997)). Rather, the question is whether her failure to comply with Biogen's request for documentation " 'truly was the reason for the plaintiff's termination.' " *Id.* Jefferson's arguments may question Biogen's judgment, but the record confirms that Jefferson failed to ever submit the requested medical documentation to Biogen. Under these circumstances, a reasonable jury could not find that Jefferson was wrongfully discharged on the basis of her disability/handicap.

## V. CONCLUSION

For the foregoing reasons, Defendant Biogen Idec, Inc.'s Motion for Summary Judgment [DE-30] is ALLOWED and its Motion to Strike [DE-38] is DENIED. The Clerk of Court is DIRECTED to remove this action from the court's pretrial and trial calendars and to close this

case.

SO ORDERED.

This the 22ⁿᵈ day of August, 2012.

James C. Fox
Senior United States District Judge

17